UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NDUDI ANIEMEKA and OBIAGELI ) <br> ANIEMEKA, ) <br> ) <br> Defendants. ) | No. 17 C 4011 <br><br> Judge |

## COMPLAINT

The United States of America, by Joel R. Levin, Acting United States Attorney for the Northern District of Illinois, for its complaint states as follows:

### Jurisdiction and Venue

1. This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-33, and under common law theories of payment by mistake of fact, unjust enrichment, and fraud. This court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

2. Venue is proper in the Northern District of Illinois pursuant to 28 US.C. § 1391(b) and 31 U.S.C. § 3732(a), because the defendants reside and transact business in this district.

### Parties

3. Plaintiff, the United States of America, acting through the Department of Health and Human Services (HHS), administers the Health Insurance Program for the Aged and Disabled established by Title XVII of the Social Security Act (Act), 42 U.S.C. § 1395 *et seq.*, (Medicare), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42 U.S.C. §§ 1396 *et seq.*, (Medicaid).

4. Defendants Ndudi C. Aniemeka and Obiageli P. Aniemeka (the Aniemekas) reside in Oak Park, Illinois. Ndudi Aniemekas was a licensed as physician by the State of Illinois at all times relevant to this complaint. Since at least July of 2005, the Aniemekas have maintained an office at 5219 West Madison Street, Chicago, Illinois.

**The Law**

5. The False Claims Act (FCA) provides, in pertinent part that:

(a) Any person who —

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]

(3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information —

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(a), (b) (FCA, pre-2009 amendments). The False Claims Act was amended by the Fraud Enforcement and Recovery Act of 2009, Public Law 111-21. 31 U.S.C. § 3729(a)(1)(A), (B) (reflecting changes to the wording of the pre-2009 FCA provisions previously found at 31 U.S.C. § (a)(1), (2) and (3)). *See also* 28 C.F.R. § 85.3(a)(9) (detailing current civil penalties of not less than $5,500 and not more than $11,000 for violations of the FCA).

6. The Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-Fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

7. The Anti-Kickback Act prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally funded medical services, including services provided under the Medicare and Medicaid programs:

> (b) Illegal remunerations
>
>> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>>
>>> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>>
>>> (B) in return for purchasing, leasing, ordering or arranging for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>>
>> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, to civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

      8.      In 2010, Congress amended the Anti-Kickback Act to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010 (PPACA), Pub. L. No. 111–148 § 6402(f), 124 Stat. 119, 759 (codified at 42 U.S.C. § 1320a–7b(g)).

**The Medicare Program**

9. The Medicare program, which Congress enacted in 1965 as Title XVIII of the Social Security Act, pays for the costs of healthcare services for certain individuals. HHS is responsible for the administration and supervision of the Medicare Program, which it does through CMS, an agency of HHS.

10. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility, and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B primarily covers physician and other ancillary services, including some home health services. *See* 42 U.S.C. § 1395k.

11. HHS is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services (CMS) is an agency of HHS and is directly responsible for the administration of the Medicare program.

12. "Home health care" is a term describing a wide range of both medical and non-medical services provided to patients in their home.

13. Under Medicare, the United States pays for certain home health services rendered to Medicare beneficiaries who meet specific coverage requirements. 42 U.S.C. §§ 1395d(a)(3), 1395k(a)(2)(A). Services covered under this benefit include part-time or intermittent skilled nursing care, speech-language pathology, physical or occupational therapy, part-time or intermittent skilled home health aide services, and medical social services. 42 U.S.C. § 1395x(m).

14. Medicare will pay for home health services for up to 60 days only if a physician certifies that:

      a.      the patient needs skilled nursing care, speech-language pathology, or physical or occupational therapy;

      b.      the patient is confined to the home ("homebound"); and

      c.      a plan of care has been established by and is periodically reviewed by a physician.

42 C.F.R. § 424.22; 42 C.F.R. §§ 409.41, 409.42. Medicare will pay for an additional 60-day period or periods of care for a patient if a physician re-certifies that the above conditions exist and also re-certifies a plan of care for the patient.

    15.    Throughout the relevant period, Medicare paid home health providers under what is known as the Health Insurance Prospective Payment System ("HIPPS").

    16.    Under the HIPPS, home health agencies receive a set amount per Medicare patient to provide all necessary home health services for up to 60-day "episodes" of care.

    17.    The HIPPS rate is intended to reimburse the home health agency for all reasonable and necessary nursing and therapy services, routine and non-routine medical supplies, and home health aide and medical social services required for the care of an individual patient during that 60 days.

    18.    The amount of the payment for each 60-day episode of care is adjusted to account for the patient's health condition, clinical characteristics, and service needs.

    19.    The adjustment in payment for the patient's health condition, clinical characteristics, and service needs is known as the case-mix adjustment. Currently there are 80 case-mix groups, or Home Health Resource Groups ("HHRGs"), in which to classify patients for payment purposes.

20. At the beginning of each 60-day episode of care, the home health agency assesses the patient's condition and likely need for skilled nursing care or therapy using an instrument called the Outcome and Assessment Information Set ("OASIS"). The OASIS contains certain data elements designed to assess a patient's "clinical severity domain," "functional status domain," and "service utilization domain." Each data element is assigned a score value. The HHRG in which the patient falls, and the HIPPS code used to determine the home health agency's payment amount, is determined by summing the score values reflected on the OASIS.

21. Medicare pays 60% of the estimated payment for the first 60-day episode of care as soon as the medicare administrative contractor (MAC) receives the home health provider's initial claim. (A "MAC" is a private health care insurer that processes claims for HHS.) The estimated payment is based upon the patient's HHRG, which, as described above, is derived from the OASIS. The residual 40% of the payment is made at the close of the 60-day episode, unless there is some applicable adjustment to the payment amount. For subsequent episodes of care, the initial and residual payments are split evenly.

22. Medicare enters into provider agreements with providers and suppliers to establish their eligibility to participate in the program. In order to be eligible for payment under the program, physicians must certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . . The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

CMS Form 855I.

23. Ndudi Aniemeka was obligated to make and comply with this certification in order to be eligible to submit claims to Medicare.

24. As detailed below, Ndudi and Obiageli Aniemeka submitted and/or caused claims to be submitted to Medicare Part A for services purportedly provided to beneficiaries.

25. Compliance with the Anti-Kickback Act is a condition of payment for both Medicare and Medicaid.

### Factual Allegations

26. Grand Home Health care, Inc. (Grand), a corporation organized under the laws of the State of Illinois and located at 7435 W. Belmont Avenue in Chicago, Illinois, was in the business of providing home health care services to Medicare beneficiaries. Grand submitted claims to Medicare and received reimbursement for such services.

27. Nixon Encinares was a nurse licensed in the State of Illinois and the past-president and 50% owner of Grand. Maria Buendia was a nurse licensed in the State of Illinois and was also a 50% owner of Grand.

28. On June 27, 2012, Encinares and Buendia were indicted for offering and paying kickbacks to induce the referral of patients to Grand for the furnishing of home health care services for which payment could be made in whole or in part through Medicare.

29. On April 24, 2013, Encinares and Buendia pleaded guilty to conspiring to offer and pay kickbacks to various individuals in violation of 18 U.S.C. § 371 and the Anti-Kickback Statute, 42 U.S.C. 371 and the Anti-Kickback Statute, 42 U.S.C. § 1320a7b(b)(2)(A).

30. Ndudi Christopher Aniemeka and Obiageli Patricia Aniemeka accepted $98,550 in cash payments from Grand in exchange for referring patients to the home health agency between

February 24, 2009, and August 16, 2010.

31. Between February 24, 2009, and August 16, 2010, the Aniemekas knew that patients they referred to Grand would receive home health services for which Grand would submit claims for reimbursement to Medicare.

32. During the relevant time period, Grand received $420,424.32 in reimbursements from Medicare for patients referred to Grand by the Aniemekas.

### Count I

### False Claims Act, 31 U.S.C. § 3729(a)(1)
### Causing the Submission of False Claims to
### Medicaid and Medicare for Services Rendered as a Result of Kickbacks

33. Plaintiff incorporates by reference paragraphs 1-32 of this complaint as if fully set forth.

34. Defendants knowingly caused false claims for payment or approval to be presented to the United States in violation of 31 U.S.C. § 3729(a)(1) (pre-2009 amendments) and 31 U.S.C. § 3729(a)(1)(A) (current version of FCA) when they caused the submission of claims to Medicare for home health services rendered as a result of kickbacks and/or illegal remuneration in violation of the Anti-Kickback Act.

35. By virtue of the false and/or fraudulent claims defendants caused to be submitted, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count II

### Unjust Enrichment

36. Plaintiff incorporates by reference paragraphs 1-32 of this complaint as if fully set forth.

37. This is a claim for the recovery of monies by which the defendants have been

unjustly enriched.

38. By directly or indirectly obtaining government funds to which they were not entitled, defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

**Prayer for Relief**

WHEREFORE, plaintiff, United States of America requests that judgment be entered in its favor and against defendants as follows:

1. On the Count I, under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2. On the Count II, for unjust enrichment, for the damages sustained and/or amounts by which the defendants were unjustly enriched or by which defendant retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

Respectfully submitted,

JOEL R. LEVIN
Acting United States Attorney

By: s/ Donald R. Lorenzen
DONALD R. LORENZEN
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5330
donald.lorenzen@usdoj.gov