UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 17 C 4011 |
| ) | |
| NDUDI ANIEMEKA and ) | Judge Rebecca R. Pallmeyer |
| OBIAGELI ANIEMEKA, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

The United States brought this civil action against Dr. Ndudi Aniemeka and his wife, Obiageli Aniemeka, under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–33. The government alleged that Defendants accepted illegal kickbacks from home health care providers in exchange for referrals of patients with Medicare coverage. Following a five-day trial in spring 2023, a jury found the Aniemekas jointly and severally liable for 158 false claims in the total amount exceeding $425,000, and the government successfully moved for entry of a $3 million judgment in treble damages and civil penalties. Defendants have not challenged the judgment as against Obiageli Aniemeka, which was amply supported by the evidence. They have moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), asking the court to vacate the verdict and judgment as to Dr. Ndudi Aniemeka. For the reasons described below, the motion is denied.

## BACKGROUND

The court presumes familiarity with its 2019 opinion addressing Defendants' motion to dismiss, which recounted the basic factual background for this case. *United States v. Aniemeka*, No. 17 CV 4011, 2019 WL 2103400 (N.D. Ill. May 13, 2019). The trial evidence completes the picture. Briefly: Dr. Ndudi Aniemeka owns and operates Boycin Medical Clinic ("Boycin") on the west side of Chicago, and his wife Obiageli manages the clinic's finances and administration.

(Trial Transcript ("Tr.")) 527:25–528:13, 532:16–533:11, 641:18–642:12.)[1] Between 2008 and 2010, the Aniemekas referred patients in need of home health care services to Grand Home Health Care, Inc. ("Grand"), a company owned and operated by nurses Maria Buendia and Nixon Encinares. (Tr. 175:12–16, 479:14–480:11, 561:6–23.) In 2011, Buendia and Encinares pleaded guilty to charges of conspiring to offer and pay kickbacks to numerous health care providers in exchange for patient referrals that were reimbursed under Medicare. (Tr. 175:17–178:16, 480:16–482:12.) As part of their plea deal, they agreed to cooperate with the government's investigation of individuals who had received these kickbacks, including by participating in recorded telephone calls and, ultimately, testifying at trial. (Tr. 176:3–178:6, 481:6–15.) In 2017, the government filed this civil case against the Aniemekas, alleging that they caused false claims to be submitted to Medicare in that those claims were the product of illegal kickbacks as defined under the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b.[2] (*See* Compl. [1].)

After several years of motion practice and discovery, this court held a five-day jury trial on the Aniemekas' case from April 25 to May 2, 2023. Both Encinares and Buendia testified for the government, and the government also called both Defendants as witnesses during its case-in-chief. (Tr. 172:20–24, 474:22–475:2, 527:16–24, 616:14–617:8.) Buendia and Encinares testified that they had given Ms. Aniemeka over $82,000 in cash, as well as various gifts, from early 2009 to early 2010, in exchange for Dr. Aniemeka's patient referrals. (Tr. 242:18–252:22, 294:14–295:25, 494:2–496:24.) The government also introduced Buendia's handwritten ledgers documenting cash payments made to "Dr. Aniemeka," "Dr. A.," and "Ms. A.," as well as a $12,500

---

[1] While the court will cite to the trial transcript as a single continuous document, it is available on the court's docket in seven parts as follows: pages 1-97 [234], pages 98-234 [235], pages 235-386 [236], pages 387-524 [237], pages 525-718 [238], pages 719-916 [239], pages 917-1028 [240].

[2] The government also brought criminal charges against other physicians for participating in the same scheme orchestrated by Grand. *See, e.g.*, *United States v. Patel*, 778 F.3d 607 (7th Cir. 2015).

check made out to "LifeBridge," a company co-owned by Ms. Aniemeka. (Tr. 268:21–270:8, 272:11–22, 278:13–23, 284:8–19.) Other witnesses included several Medicare program contractors, Special Agent Peter Thelier of the U.S. Department of Health and Human Services, who helped launch the initial investigation into Grand's conduct, and forensic accounting expert Shari Schindler, who analyzed Grand's and the Aniemekas' financial records for evidence of kickbacks. (Tr. 43:8–44:15, 113:1–115:2, 353:24–354:4, 811:13–812:2, 821:14–20.)

Following the close of the government's case-in-chief, Defendants presented no additional evidence (Tr. 918:20–24) and instead moved for judgment as a matter of law under Rule 50(a) as to Dr. Aniemeka alone.[3] (Tr. 887:20–888:5). Defense counsel acknowledged "factual questions between [Buendia's] and Ms. Aniemeka's testimony that would preclude" judgment as a matter of law in her favor, but argued that the government had presented no evidence from which a reasonable jury could conclude that "Dr. Aniemeka had any knowledge of [the] payments" from Buendia to Ms. Aniemeka or had ever discussed a kickback scheme with anyone. (Tr. 887:10–11, 889:6–7.) The government opposed the motion (Tr. 889:11–890:10), and the court entered and continued it pending the jury's deliberations (Tr. 890:11–13).

On May 2, 2023, the parties presented their closing statements and the court submitted the case to the jury. (Tr. 939:13–15, 1019:14–1021:19.) In a little over an hour and a half, the jury answered special interrogatories and reached a verdict, finding both Defendants liable for 158 FCA violations—resulting in a total cost of $425,976.32 improperly billed to Medicare. (Tr. 1021:20–1022:25.) After the jury was discharged, the court gave Defendants "60 days in which

---

[3] As of the time of Defendants' initial Rule 50 motion and the jury's verdict, the Aniemekas were still married. Assuming this is still the case, vacating the verdict as to Dr. Aniemeka alone may have little practical effect on their household finances. It is less clear whether vacating the verdict would have other collateral consequences: prior to trial, the government asserted that Dr. Aniemeka would not automatically lose his medical license or his ability to care for Medicare patients if found liable, though Medicare could elect to revoke these privileges via a separate administrative proceeding. (Tr. 83:24–84:15.)

3

to file posttrial motions," including the motion for judgment as a matter of law as to Dr. Aniemeka. (Tr. 1025:24–1026:2; *see* Minute Entry [221].)

One week later, however, the government moved on May 9 for prompt entry of judgment against the Aniemekas under Rule 58, in the form of $1.2 million in treble damages (thrice the cost to Medicare set forth in the jury's verdict) and $1.7 million in civil penalties under the FCA ($11,000 per false claim for each of the 158 false claims resulting from Defendants' conduct). (Mot. for Entry of J. [225] at 6.) In this same submission, the government also moved to vacate the court's previously established briefing schedule "in favor of motion practice in accord with the existing rules." (*Id.*) It expressed "concern[] for defendants that their current briefing schedule could result in a forfeiture of defendants' district court and appellate rights," since Rules 50(b) and 59 "require a motion to be filed within 28 days of entry of judgment" and do not toll the time to appeal unless filed within this timeframe. (*Id.* at 5 (citing FED. R. CIV. P. 50(b), 59, 60(b); FED. R. APP. P. 4(a)(4)(A)).) The court granted the government's motion for entry of judgment via minute order the next day and directed the government to prepare a proposed order, but stated in this entry that the "[b]riefing schedule for post-trial motions remains in effect." (Minute Order [226]). Judgment was entered on May 12, 2023 [227].

Defendants did not in fact file anything within 28 days of this entry of judgment, nor did they meet the court's own (too generous) deadline for post-trial motions of July 3, 2023. The court heard nothing from Defendants until August 11, when they belatedly moved the court to extend their already-lapsed deadline for post-trial briefing to August 21. (Mot. to Extend Time [228].) They submitted with this motion a sealed affidavit from their counsel outlining the reasons for this delay, which related to medical concerns. (Sealed Exhibit [229].) The court granted this motion via minute order [230]; this time, Defendants met the deadline, filing a four-page Rule 50(b) motion seeking judgment as a matter of law as to Dr. Aniemeka on the same ground raised at trial. (*See* Defs.' Renewed Mot. for J. as a Matter of Law [231] ("Def.'s Mot.").) The government filed a brief

4

in opposition on October 23 (Opp. to Mot. for J. as a Matter of Law [242] ("Gov.'s Opp.")), and there has been no reply. Defendants' motion is now before the court for decision.

## DISCUSSION

### I. Timeliness

The threshold question is whether Defendants' renewed motion for judgment as a matter of law is untimely. Rule 50(b) directs that parties file renewed motions for judgment as a matter of law "[n]o later than 28 days after the entry of judgment . . . ." FED. R. CIV. P. 50(b). District courts can generally alter or extend deadlines in the Rules for "good cause," but Rule 6(b) carves out a specific exception for certain post-judgment motion deadlines: "[a] court *must not* extend the time to act under Rules 50(b) and (d), 52(b), 59(b), (d), and (e), and 60(b)." *Id.* 6(b)(2) (emphasis added). The Seventh Circuit has interpreted this to conclude that district courts lack discretion to modify deadlines set forth under these Rules. *Blue v. Int'l Bhd. of Elec. Workers Loc. Union 159*, 676 F.3d 579, 582 (7th Cir. 2012). This court was therefore without authority to maintain its initial post-trial briefing schedule after entering judgment in the government's favor on May 12, 2023. Thus, despite the court's minute order [226] to the contrary, Defendants were required to submit their motion no later than June 9, 2023. They did not. The government—having flagged the issue for both this court and Defendants in its motion for entry of judgment—now asks the court to dismiss Defendants' motion as untimely.

The court acknowledges that its decision to adhere to the post-trial briefing schedule that it announced from the bench was error and could have misled Defendants. In past years, the equitable doctrine of "unique circumstances" allowed courts to entertain late filings where a "district judge ha[s] no authority to extend the time," but "a lawyer, not knowing the law, *actually* relies on the affirmative misstatement of the district judge" to the contrary. *Bailey v. Sharp*, 782 F.2d 1366, 1369 (7th Cir. 1986) (emphasis in original) (citing *Eady v. Foerder*, 381 F.2d 980 (7th Cir. 1967)); *cf. Osterneck v. Ernst & Whinney*, 489 U.S. 169, 179 (1989) (holding that party's late appeal would be excused if he "has received specific assurance by a judicial officer that [an]

5

act has been properly done"). In this case, however, this doctrine does not excuse Defendants' untimely filing. First, its "continued validity has been seriously questioned both in [the Seventh Circuit] and in the Supreme Court . . . ." *Robinson v. City of Harvey*, 489 F.3d 864, 871 (7th Cir. 2007) (citations removed); *see Bowles v. Russell*, 551 U.S. 205, 214 (2007) (overruling the "unique circumstances" doctrine as to deadlines that are deemed jurisdictional rather than claims-processing). Second, to the extent the "unique circumstances" doctrine even retains any vitality today, it is "narrow" and applies "only where there is a genuine ambiguity in the rules to begin with . . . [that] the court resolves . . . in the direction of permitting additional time to appeal"—an ambiguity that the Seventh Circuit has declined to find in Rule 6(b)'s "express[]" language. *Robinson*, 489 F.3d at 871 (citing *Props. Unlimited, Inc. Realtors v. Cendant Mobility Servs.*, 384 F.3d 917, 922 (7th Cir. 2004)). The Seventh Circuit has further held that "[m]erely entering a minute order that apparently extends the time for filing a [post-trial] motion . . . is not enough to count as a 'specific assurance' from the court." *Props. Unlimited*, 384 F.3d at 921; *see also e2Interactive, Inc. v. Blackhawk Network, Inc.*, No. 09-CV-629-SLC, 2012 WL 13000463, at *2 (W.D. Wis. Oct. 22, 2012) ("[T]his court does not have the authority to extend the 28-day deadline for filing Rule 50(b) and Rule 59 motions and [defendant] cannot rely on my text only order stating otherwise.").

The court notes here that it is not even clear that Defendants' counsel "actually relie[d]" on the court's minute order in a way that might somehow justify an equitable departure from the Rules' text. *Bailey*, 782 F.2d at 1368. Defendants missed not only the Rule's 28-day deadline of June 9, 2023, but also the court's original 60-day deadline of July 3, 2023. Their motion came a full 101 days after the entry of judgment—and while it is true that the court granted Defendants amnesty to file this late motion [230], this retroactive approval would have had no bearing on their initial decision to blow past the 28-day mark. What is more, Defendants have never responded to the government's arguments on timeliness and have not filed a reply brief, despite the court's express invitation for them to do so. The court must therefore deem Defendants' Rule 50(b)

6

motion untimely. *See Aponte v. City of Chi.*, No. 09 C 8082, 2012 WL 1533309, at *3 (N.D. Ill. Apr. 26, 2012) (denying late Rule 50(b) motion on purely procedural grounds without reaching merits).

II.     **Review under Rule 60(b)**

As the government acknowledges, the court still has discretion to construe the untimely motion as one for relief from judgment under Rule 60(b). *Blue*, 676 F.3d at 585 (holding that Rule 50's time limits are claims-processing rather than jurisdictional and that district courts may choose to convert untimely Rule 50(b) motions into Rule 60(b) motions); *cf. Kiswani v. Phoenix Sec. Agency, Inc.*, 584 F.3d 741, 742–43 (7th Cir. 2009) (holding that an untimely filed Rule 59(e) motion "automatically becomes a Rule 60(b) motion") (citation omitted).

Even if the court were to exercise this discretion and entertain Defendants' motion under the standards of Rule 60, however, it would fail. Rule 60(b), which is not subject to the same 28-day time limit as Rules 50 or 59,[4] allows for relief from a final judgment for six specific reasons: (1) "mistake," (2) "newly discovered evidence," (3) "fraud," (4) a "void" judgment, (5) a "satisfied, released, or discharged" judgment, or (6) "any other reason that justifies relief." FED. R. CIV. P. 60(b). A motion under Rule 60(b) must fall into one of these categories. *See Banks v. Chi. Bd. of Educ.*, 750 F.3d 663, 667 (7th Cir. 2014)

A timely Rule 50(b) motion would call on the court to review the verdict under the familiar deferential standard of "whether the jury had 'a legally sufficient evidentiary basis' for its verdict," drawing all reasonable inferences in favor of the party who prevailed at trial and not second-guessing any credibility determinations. *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2013) (citing FED. R. CIV. P. 50(a)(1)); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000). The inquiry under Rule 60(b) is even narrower: "[r]elief under this provision is an

---

[4] *See* FED. R. CIV. P. 60(c) (requiring that motions under Rule 60(b) "be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment").

extraordinary remedy," *Banks*, 750 F.3d at 668 (citation and internal quotation marks omitted), and should be granted "only upon a showing of extraordinary circumstances that create a substantial danger that the underlying judgment was unjust," *Margoles v. Johns*, 798 F.3d 1069, 1073 (7th Cir. 1986); *see e2Interactive*, 2012 WL 13000463, at *2 (characterizing Rule 60(b)'s standard of review as "more restrictive" than Rule 50(b)'s). The moving party must meet a "heavy burden" in showing that these circumstances are present. *YL Chicago Fund, LLC v. 5035 N. Lincoln Ave., LLC*, No. 20-CV-3940, 2020 WL 7183748, at *4 (N.D. Ill. Dec. 7, 2020) (citation omitted). The district court may consider a "wide range of factors" in evaluating a Rule 60(b)(6) motion, including "the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process." *Buck v. Davis*, 580 U.S. 100, 123 (2017) (citation and internal quotation marks omitted). In general, however, "grounds for setting aside a judgment under this rule must be something that could not have been used to obtain a reversal by means of a direct appeal." *Kiswani*, 584 F.3d at 743 (citing *Bell v. Eastman Kodak Co.*, 214 F.3d 798, 801 (7th Cir. 2000)).

Defendants' motion to vacate the jury's verdict as to Dr. Aniemeka based on insufficient evidence does not present the sort of "exceptional circumstances" that would warrant relief under Rule 60(b). As an initial matter, Rule 60(b) is not a proper procedural vehicle to evaluate such a motion, as "sufficiency of the evidence arguments are the proper subject of a timely appeal, not a Rule 60(b) motion for relief from the judgment." *Rowe v. Ashdown*, 173 F.3d 846, 1999 WL 147041, at *2 (2d Cir. 1999) (unpublished table opinion); *see Luera v. Lyerla*, No. 3:15-CV-00350-MAB, 2019 WL 4750569, at *4 (S.D. Ill. Sept. 30, 2019) (finding that an untimely Rule 59 motion based in part on a claim that the jury's verdicts were "against the manifest weight of the evidence" presented a "ground[] for reversal that can and should be presented to the appellate court on direct appeal and [was] thus precluded by the scope of Rule 60"). In at least some cases, however, courts appear to have entertained the merits of untimely Rule 50(b) motions under Rule

8

60(b)(6)'s "catchall" provision.[5] *Blue*, 676 F.3d at 585 (construing merits of untimely Rule 50(b) motion under Rule 60(b)(6)); *cf. e2Interactive*, 2012 WL 13000463, at *3 (construing similar motion under both Rule 60(b)(6) and 60(b)(2), where the movant also asserted newly discovered evidence).[6] Even so, such arguments rarely succeed. *See Luera*, 2019 WL 4750569, at *4 ("Even if the Court assumes that [Defendants'] Rule [50] motion was timely or that [their] arguments fell within the scope of Rule 60, [their] motion would still be denied."); *cf. Young v. Mayer*, No. 20-CV-1136-JPS, 2023 WL 8367923, *4–6 (E.D. Wis. Nov. 27, 2023) (addressing and rejecting, "for the sake of thoroughness," merits arguments in "untimely post-verdict 'supplemental brief' in support of [a] timely, but skeletal, Rule 50 motion").

Were this court to reach the sufficiency-of-the-evidence argument, the argument would not be a winning one. Defendants contend here, as they did at trial, that there was no evidence from which the jury could reasonably infer that Dr. Aniemeka knew about Grand's illegal kickback scheme. They point to Buendia's trial testimony that the doctor was not present at the initial

---

[5] At least one court in this district has taken a different approach. In *Torres v. City of Chicago*, the court concluded that its own error in granting an extension of time to file post-trial motions beyond what the Rules permitted constituted a "mistake" within the meaning of Rule 60(b)(1). No. 12 C 7844, 2016 WL 4158914, at *3 (N.D. Ill. Aug. 5, 2016). The *Torres* court noted in reaching this conclusion that "[t]he ' "mistake" and "inadvertence" language of subsection (1)…includes inadvertence on the part of both courts and parties.'" *Id.* (citing *Mendez v. Republic Bank*, 725 F.3d 651, 658 (7th Cir. 2013). It then proceeded to analyze the merits of the plaintiffs' motion under Rule 50(b)'s legal standard for judgment as a matter of law. *Id.*
  This reasoning, however, seems at odds with both the Seventh Circuit's approach in *Blue* and with the text of Rule 60(b), which specifies that the "mistake" in question must itself be the "reason[]" for granting relief from a judgment. FED. R. CIV. P. 60(b). This court will follow the weight of authority holding that review of an untimely motion under Rules 50 or 59 should still be "constrained by Rule 60," even if the court itself erred earlier in calendaring the deadlines for this motion. *Blue*, 676 F.3d at 585–86; *see e2Interactive*, 2012 WL 13000463, at *2; *Luera*, 2019 WL 4750569, at *3 ("Rule [59] and Rule 60(b) will retain their distinct characters, and litigants should not expect to employ our rule as a Trojan horse for sneaking what are actually tardy Rule [59] motions into the courtroom under the guise of Rule 60(b).") (citing *United States v. Deutsch*, 981 F.2d 299, 302 (7th Cir. 1992)).

[6] In this case, the government itself does not clearly dispute that this court may consider the merits under Rule 60. (*See* Gov.'s Opp. at 9–10 (acknowledging that the court may convert Defendants' motion into a Rule 60(b) motion, but arguing that their sufficiency-of-the-evidence argument fails on the merits "[r]egardless of the procedural vehicle" under which it is brought).

9

conversation where his wife allegedly demanded payment in exchange for referrals (Tr. 241:14–17); that he never met with Buendia one-on-one (Tr. 566:1–24); that he was never present when Buendia made the alleged payments to his wife (Tr. 248:13–17, 349:10–15); and that, in general, Buendia's only point of contact in the alleged kickback scheme was Ms. Aniemeka (Tr. 244:8-24, 254:5-255:9, 259:15-20, 266:15-20, 267:24-268:18). Dr. Aniemeka himself testified in the government's case-in-chief that he had no knowledge of any cash kickbacks (Tr. 587:18–588:2), was not significantly involved in selecting home health care providers (Tr. 569:13–573:13) and lacked any recollection of his wife's conversations with Buendia about referring patients to Grand (Tr. 585:16–586:15).

The first question in addressing these arguments is what knowledge standard the government was required to meet as to Dr. Aniemeka. The government's theory for finding the challenged Medicare submissions "false" for FCA purposes is that they were made in exchange for illegal kickbacks as defined under the AKS. *See* 42 U.S.C. § 1320a-7b(g) (specifying that claims for payment that include "items or services resulting from a violation of [the AKS]" are false or fraudulent for purposes of the FCA). Accordingly, the court instructed the jury that "in determining whether the defendants violated the False Claims Act, you will first have to determine whether defendants violated the Anti-Kickback Statute." (Tr. 930:19–23.) The AKS requires that a defendant have "knowingly and willfully solicit[ed] or receiv[ed]" remuneration in exchange for a referral or other benefit. 42 U.S.C. § 1320a-7b(b). While the AKS does not specifically define "knowingly and willfully," the jury was instructed that "[a]n act is done knowingly if the act was done voluntarily and intentionally, not because of mistake or accident," and that a defendant acts "willfully" by acting "with a bad purpose either to disobey or disregard the law . . . while knowing that his or her actions are unjustifiable and wrong."[7] (Tr. 931:19–932:2.) Thus, the government

---

[7] Dr. Aniemeka's knowledge of Medicare's general prohibition on kickbacks is not at issue here. As an initial matter, the AKS specifically provides that "a person need not have actual

10

needed to prove that Dr. Aniemeka actually knew about the kickbacks and their illegality in order to show that he violated the AKS—and, in turn, the FCA, by "knowingly" causing claims exchanged for these kickbacks to be submitted to Medicare.[8]

---

knowledge of this section or specific intent to commit a violation of this section," 42 U.S.C. § 1320a-7b(h), and the jury was accordingly instructed that "[a] defendant may act knowingly and willfully although they are not aware of the specific law that their conduct may be violating" (Tr. 932:3–5). More to the point, Defendants do not dispute that they both knew taking payments in exchange for patient referrals is illegal under the Anti-Kickback Statute, and that they repeatedly affirmed to Medicare that they would not do so. (Tr. 70:4–71:20, 74:22–76:17, 539:3–545:2, 657:10–658:9.)

[8] Unlike the AKS, the FCA expressly defines "knowingly" to encompass not only actual knowledge, but also "deliberate ignorance" and "reckless disregard." 31 U.S.C. § 3729(b). In its closing argument, the government offered the jury an alternative theory under which it could find both Aniemekas liable under this broader *scienter* standard:

> Now, there's a possibility -- in the unlikely event that you decide that Dr. Aniemeka did not act with actual knowledge, you then have to determine whether he acted with deliberate ignorance of the truth. This is akin to or known as ostrich sticking their head in the sand. Was he ignoring these things? Was he completely ignoring what the truth was right in front of him? We submit he was. . . . So if you determine -- if you don't determine he acted with actual knowledge or deliberate ignorance of the truth, you could also find he acted with reckless disregard for the truth. He had a duty, but he failed to investigate. . . . Over and over, his wife was getting these things, and he chose not to look into it.

(Tr. 971:9–973:5.) In other words, the government argued that it need not meet its burden of establishing every element of both statutes as to both defendants: if it could prove that Ms. Aniemeka had actual knowledge of the kickback scheme for AKS purposes, Dr. Aniemeka could be held liable under the FCA for having made the referrals with deliberate ignorance or reckless disregard as to this scheme.

This theory would certainly bolster the jury's verdict: If the evidence is mixed on whether Dr. Aniemeka acted with actual knowledge, it much more clearly supports a finding that he was deliberately or recklessly blind to the clear signs of kickbacks unfolding in his clinic—such as his wife's receipt of expensive gifts and the unexplained large cash deposits to his joint checking account. But this legal theory was not clearly expressed in the court's instructions to the jury. (*See* Tr. 930:19–23 ("[I]n determining whether the defendants violated the False Claims Act, you will first have to determine whether *defendants* [plural] violated the Anti-Kickback Statute.") (emphasis added)).

Nevertheless, the court need not even reach the question of which knowledge standard ultimately controlled the jury's decision. As set forth below, the evidence was sufficient for a reasonable jury to find that the government satisfied the more restrictive standard of actual knowledge on Dr. Aniemeka's part.

11

The jury concluded the government met this burden, and Defendants have identified no "extraordinary circumstances" that would justify overturning that conclusion. To prove Dr. Aniemeka's liability, the government presented witness testimony from Ms. Buendia, Defendants' business and banking records, and Dr. Aniemeka's own testimony—as well as his wife's—that confirmed his responsibility over the clinic's patient referral system. As Defendants correctly point out, all of this evidence is circumstantial: the jury neither saw nor heard anything directly establishing that Dr. Aniemeka knew about the kickbacks. But any "qualms" the court might have concerning on the strength of the government's case against Dr. Aniemeka are "precluded by the scope of review under Rule 60." *Blue*, 676 F.3d at 586. As the following sections will show, the government's showing was not "so weak that there was a significant probability of a miscarriage of justice here." *Id.*

### A. Gifts Evidence

The government first argues that Dr. Aniemeka's own testimony on gifts that his wife received was sufficient to establish that he actually knew about the kickback schemes. Dr. Aniemeka acknowledged that he was aware his wife received a number of luxury gifts from Buendia, including a designer handbag. (Tr. 588:19–590:14.) These gifts fall within the AKS's broad definition of "remuneration" as "anything of value." *United States ex rel. Derrick v. Roche Diagnostics Corp.*, 318 F. Supp. 3d 1106, 1113 (N.D. Ill. 2018). Buendia testified that she had given these gifts "as a token for referring patients to us" because she "wanted the business to keep coming." (Tr. 295:14–20.) Dr. Aniemeka, however, denied that there is anything inappropriate or illegal about giving and receiving these gifts and described them as merely "business practice today in America." (Tr. 589:2–590:24.)

One way of interpreting this testimony is that Dr. Aniemeka was simply unaware that Medicare's prohibition on kickbacks extended to gifts of this nature. A second is that he believed in good faith that they were meant merely as a business or personal courtesy, rather than as a quid pro quo. A third is that he was simply lying (to the jury and perhaps also to himself), and

12

knew full well that the gifts were given as a payment for his continued referrals to Grand; perhaps he believes informal kickbacks are "business practice" in this nation. Either of the first two interpretations might call into question whether he acted "knowingly and willfully" for AKS purposes, but that is of no moment here. All are plausible, and it was the jury's right to weigh them and reach a conclusion unfavorable to Defendants. To the extent the jury relied on the gifts evidence in finding that Dr. Aniemeka knew of the kickback scheme, the court cannot say that they acted unreasonably in doing so, or that ruling otherwise would create a clear and substantial "risk of injustice." *Buck*, 580 U.S. at 123.

### B. Payments Evidence

Next, the government argues that Dr. Aniemeka's financial records supported the jury's conclusion that he knowingly and willfully accepted payments from Grand. It is undisputed that Defendants shared a joint personal checking account to which they both had access during the relevant timeframe in the case from 2009 to 2010. (Tr. 591:5–9, 844:10–23.) Buendia's handwritten notebooks, which were introduced at trial and provided a detailed record of her payments made to various health care providers, reflect some $82,650 in payments made to Defendants during this time period. (Tr. 823:13–22, 834:2–4.) Dr. Aniemeka's bank records show over $54,000 in cash deposits into his and his wife's accounts during this same period, including $49,000 into the joint checking account. The government's forensic accountant testified that there was a temporal relationship between Buendia's recorded payments and these cash deposits, and that such large deposits were highly unusual given the nature of the Aniemekas' business. (Tr. 824:4–7, 857:2–5, 869:12–870:4.)

While Dr. Aniemeka acknowledged that he had access and control to the joint checking account, he denied that the cash deposits in question came from Buendia. (Tr. 591:18–592:1.) Rather, he asserted that they came from their "various sources of income," including rental payments for the apartment above their clinic that they rented out as well as fees from an agency that paid them to host foreign medical students. (592:5–596:17.) The government's expert,

13

however, pointed out that income from these other sources were deposited into separate bank accounts, not the Aniemeka's joint checking account. (844:14–849:8.)

Under a standard of review more generous to Defendants, the court might entertain the possibility that Dr. Aniemeka saw these payments but believed that his wife—who was responsible for managing both their business and personal finances—was moving money around between their various accounts. (Tr. 592:15–598:8, 619:13–11.) It is also, of course, theoretically possible that he did not review the balance of his checking account for the entire time period in question; he testified that the bank statements from this account were mailed to his house every month, but never specified on the stand whether he actually read them. (Tr. 592:11–24.) But the court is not entitled to draw these inferences in Dr. Aniemeka's favor. Even under Rule 50(b), the jury would be well within the bounds of reasonableness in finding that Dr. Aniemeka's bank records suggested he must have known about the kickback scheme. And under Rule 60(b)'s still-stricter standard, there is nothing "extraordinary" or manifestly unfair about inferring actual knowledge of improper kickbacks based on records of almost $50,000 in contemporaneous cash deposits into a personal checking account.

### C. Referral Process Evidence

Finally, in support of the jury's conclusion that Dr. Aniemeka knew about the kickback scheme, the government cites testimony on Defendants' process for selecting third-party home health care providers. The undisputed basics of this process, as laid out at trial, were as follows. Defendants' clinic would select a set of "preferred" providers for referrals of Medicare-eligible patients. (Tr. 240:7–10, 487:1–17, 562:2–563:15.) In order to be reimbursed for their services, these providers would need to send Medicare a Form 485 with a certification from the treating physician (Dr. Aniemeka) that the patient qualifies for and is in need of home health care. (Tr. 77:9–21, 193:11–24, 488:3–489:1, 547:15–550:25.) The provider would send this form to a staff member at Boycin, who would in turn present it to Dr. Aniemeka for signature; the signed Form

14

485 would then be returned to the provider for submission to Medicare. (Tr. 244:8–24, 573:19–576:23.)

It is undisputed that Dr. Aniemeka played a central role in this process. As the only person at Boycin capable of making the required certifications for providers—including Grand—to bill Medicare, he reviewed and signed every Form 485 that came through the clinic's door. (Tr. 193:11–24, 549:16–550:25, 699:18–23.). The government argues that this deep level of involvement supports an inference on the jury's part that Dr. Aniemeka "not only knew he was receiving kickbacks, but he had complete control over the scheme." (Gov.'s Opp. at 13.) But Defendants argue that Dr. Aniemeka was only minimally involved in selecting *which* providers received referrals, and none of this testimony proves that he knew anything about the particular 485s placed before him for signature. Buendia testified that, when she first approached Boykin on behalf of Grand to ask for patient referrals, Dr. Aniemeka brushed her off and told her to "talk to [his] wife" instead. (Tr. 240:11–14.) While Dr. Aniemeka himself did later call her to confirm the relationship (Tr. 242:6–10), Buendia had little to no contact with him throughout the period when Grand was submitting 485s to Boykin's staff for reimbursement. Instead, Buendia interacted with Ms. Aniemeka in dropping off and picking up the 485s for signature and making the alleged kickback payments. (Tr. 244:8–25, 248:13–249:2, 254:7–255:9.) And while Ms. Buendia described an alleged conversation that took place in 2010 where Ms. Aniemeka demanded a greater cut of each referral, she acknowledged that Dr. Aniemeka was not present at this conversation either. (Tr. 253:11–18.) Thus, in Defendants' view, the evidence at most suggests that Dr. Aniemeka was an unknowing participant in the kickback scheme who signed Grand's certifications without any idea of what was being demanded in exchange.

As the government observes, there was conflicting evidence about Dr. Aniemeka's level of involvement in the referral process. Ms. Aniemeka testified that Dr. Aniemeka bore final responsibility for selecting which providers to use as a matter of patient care. (Tr. 668:12–669:14, 687:16–25.) Dr. Aniemeka, for his part, initially testified that he selected agencies (such as Grand)

15

based in part on the efforts of marketers who would come to his office. (Tr. 562:6–14.) He then stated that his "main source of getting to know" agencies was through case managers and social workers with whom he worked. (Tr. 563:5–7.) With respect to Grand specifically, he testified that he heard about them via "word of mouth" through another doctor who stated that they did an "excellent job." (Tr. 564:7.) Later, however, he stated that he "usually d[id] not make the decision" of where to refer patients for home health care, and that these determinations were generally left up to his front office staff. (Tr. 569:13–572:14.) He testified that he would occasionally "recommend a particular agency that [he] kn[ew] would do a good job," but ultimately "d[idn't] know" why his clinic regularly used either Grand or any other particular provider. (Tr. 572:17–573:16.) In its closing argument, the government used this testimony to impeach both Defendants, asking the jury to question their credibility on this basis. (960:25–962:6.)

       The government's suggestion of dishonesty is not the only inference that could be drawn from Dr. Aniemeka's testimony on this front. His words could also be interpreted to suggest simple confusion or lack of familiarity—that he was, in fact, out of the loop on patient referrals and treated them largely as a day-to-day administrative matter to be delegated to his wife and office staff. But this, again, is a credibility determination outside the court's purview. "It was up to the jury to decide about context and credibility . . . [and] [a]mple evidence in the record supports its judgment." *Passananti v. Cook Cnty.*, 689 F.3d 655, 667 (7th Cir. 2012). Faced with the necessary part that Dr. Aniemeka played in the Form 485 certification process, and with the apparent contradictions in his and his wife's testimony, the jury was justified in believing the government's explanation over his.

**CONCLUSION**

Defendants' Renewed Motion for Judgment as a Matter of Law [231] is denied.

ENTER:

Dated:  February 15, 2024

_____
REBECCA R. PALLMEYER
United States District Judge